UNITED STATES, Appellant,

v.

Alvin J. DIXON, Appellee.

Michael FOSTER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 88–1375, 89–449.

District of Columbia Court of Appeals.

Argued En Banc Jan. 10, 1990.
Decided Oct. 31, 1991.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., David M. Zlotnick, Asst. U.S. Atty., and Deborah Watson, Atty., Dept. of Justice, Washington, D.C., were on the briefs, for the U.S., appellant in No. 88–1375 and appellee in No. 89–449. Michael V. Tomaselli, Asst. U.S. Atty., Washington, D.C., also entered an appearance for the U.S.

Rosemary Herbert, Public Defender Service, with whom James W. Klein and Elizabeth G. Taylor, Public Defender Service, Washington, D.C., were on the briefs, for appellee Dixon in No. 88–1375 and appellant Foster in No. 89–449.

Clifton S. Elgarten, with whom Susan M. Hoffman, M. Lisanne Crowley, Nancy J. Spencer, Laura A. Foggan, G. Diane Dodson, Aimee R. Berenson, Susan Deller Ross, and Naomi R. Cahn, Washington, D.C., were on the brief, for the Women's Legal Defense Fund, the Family Abuse Project, and The Family Place, Inc., amici curiae in No. 89–449.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, and SCHWELB, Associate Judges, and NEWMAN * and BELSON,** Senior Judges.

TERRY, Associate Judge:

These consolidated appeals, which present the same issue, arise from trial court rulings on motions to dismiss indictments on the ground of double jeopardy.

---

* Judge Newman was an Associate Judge of the court at the time of argument. He was commissioned as a Senior Judge on March 11, 1991.

** Judge Belson was an Associate Judge of the court at the time of argument. He was commissioned as a Senior Judge on July 24, 1991.

In one case the motion was granted; in the other it was denied. We hold that both motions should have been granted because both prosecutions were barred by the Double Jeopardy Clause of the Fifth Amendment. Accordingly, we affirm in one case (*Dixon* ) and reverse in the other (*Foster* ).[1]

Appellant Foster was prosecuted for criminal contempt for violating civil protection orders obtained by his wife and mother-in-law. After a bench trial in August 1988, he was convicted on four counts of criminal contempt, two of which were based on assaults committed against his wife on November 6, 1987, and May 21, 1988. He was acquitted, however, on eighteen additional counts, including those based on threats allegedly made against his wife on November 12, 1987, March 26, 1988, and May 17, 1988. The court later sentenced Foster to an aggregate of 600 days' imprisonment.

In January 1989 Foster was charged in a five-count indictment with one count of simple assault,[2] one count of assault with intent to kill,[3] and three counts of threats to injure another person.[4] The two assault charges were based upon the same assaults which underlay Foster's contempt convictions, and the threats charges were based on the same alleged threats for which Foster had been acquitted of contempt. Foster moved to dismiss the indictment on the grounds of double jeopardy and collateral estoppel. The trial court denied the motion, and Foster noted an appeal.[5]

Appellee Dixon, while on pretrial release pending trial for second-degree murder, was arrested and indicted for possession of cocaine with intent to distribute it (PWID).[6] The trial court issued an order directing Dixon to show cause why he should not be held in contempt for violating a condition of his pretrial release, namely, to refrain from committing any criminal offense. At the hearing on the show cause order, the court found beyond a reasonable doubt that Dixon had possessed cocaine with intent to distribute it. Dixon was therefore adjudicated in criminal contempt for violating the conditions of his release and sentenced to 180 days in jail. He then filed a motion in the PWID case to dismiss the indictment on the ground of double jeopardy. The judge to whom the PWID case had been assigned granted the motion in a published opinion. *United States v. Dixon*, 117 Daily Wash. L.Rptr. 9 (D.C.Super.Ct. September 26, 1988). From that dismissal the government appeals.

In light of the recent Supreme Court decision in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), we hold that the court in *Foster* erred in denying the motion to dismiss on the ground of double jeopardy. At the same time, we uphold the trial court's dismissal of the indictment in *Dixon*, again relying on *Grady v. Corbin*.

I

A. *Foster*

1. *The Contempt Proceedings*

On August 12, 1987, Judge Tignor of the Superior Court, sitting in the Intra–Family Branch of the Family Division, issued a civil protection order (CPO) stating that Michael Foster "shall not molest, assault, or in any manner threaten or physically abuse" his estranged wife, Ana Virginia Foster, for a period of twelve months from the date of the order. On the same day Judge Tignor issued a second CPO directing Foster not to "molest, assault, or in any manner threaten or physically abuse" Elvira Rivas, Mrs. Foster's mother. The

---

1. The two cases were originally argued before different divisions of this court. After each division became aware that both cases presented the same issue, the court *sua sponte* voted to consolidate them and rehear them together en banc.

2. D.C.Code § 22–504 (1989).

3. D.C.Code § 22–501 (1989).

4. D.C.Code § 22–2307 (1989).

5. The denial of a motion to dismiss an indictment or information on the ground of double jeopardy is immediately appealable. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

6. D.C.Code § 33–541(a)(1) (1988).

CPO affecting Mrs. Rivas contained the added condition that Foster stay away from her home and place of work. Foster consented in writing to both orders.

Within a fairly short time, however, Foster began to violate these orders, particularly the one relating to his wife. On September 22, and again on November 19, Mrs. Foster filed motions to adjudicate Mr. Foster in contempt, asserting that he had violated the terms of the order. The second motion included allegations that on November 6 Foster "grabbed Petitioner and threw her against a parked car" and that on November 12 he "called Petitioner at home and threatened her...." Mrs. Foster filed a third motion on May 24, 1988, alleging additional violations of the CPO. This motion stated that on March 26 Foster "called threatening Petitioner," that on May 17 he "called ... threatening to kill the Petitioner," and that on May 21 he "threw Petitioner down basement stairs, kicking her body. Respondent also pushed her head into the floor causing head injuries. Petitioner lost consciousness." In all, Mrs. Foster alleged sixteen violations of the CPO. Mrs. Rivas also filed a motion to adjudicate Foster in contempt, alleging six violations of the CPO pertaining to her.[7]

In August 1988 Judge Murphy presided over a three-day bench trial on the various charges of criminal contempt in the intrafamily case. Mrs. Foster and Mrs. Rivas, both represented by counsel, were the petitioners, and Mr. Foster was the respondent. The United States was not a party and was not represented at that trial.[8] Eight witnesses testified in support of the contempt motions, including Mrs. Foster, Mrs. Rivas, and other family members. Photographs, medical records, and other items of tangible evidence were also admitted.

Mrs. Foster identified her husband as the man who had beaten her on November 6, 1987, near her place of work, and on May 21, 1988, at her apartment on Argonne Place, N.W. She also said he had threatened her on November 12, 1987, March 26, 1988, and other occasions. With respect to the November 6 assault, the court heard additional testimony from Mrs. Rivas and from a police officer, Kenneth White. Several witnesses testified about the May 21 assault. Mrs. Foster said that Mr. Foster grabbed her and threw her down the basement stairs, then kicked her and hit her on the head until she lost consciousness. A neighbor, Ana Ruchlozo, said that she saw Mr. Foster in the apartment building on May 21, headed in the direction of the basement. Bryan Connell, a security guard, saw Mrs. Foster shortly after the assault and described her injuries ("she was bleeding very badly from the forehead [and] had very, very deep cuts on her forehead"). Connell testified that he also saw a man wielding a machete in the basement of the building soon after Mrs. Foster was injured, but that the man with the machete "was not Michael Foster." Medical records and photographs were introduced to document Mrs. Foster's injuries.

At the close of the petitioners' case, Mr. Foster's counsel moved for a judgment of acquittal on all counts. The court granted the motion with respect to seven counts, including those involving threats alleged to have been made by Foster on November 12 and May 17.[9] As to the remaining charges, however, the motion was denied.

Foster then took the stand in his own defense. He denied assaulting his wife on May 21, 1988, stating that he was in Norfolk, Virginia, visiting relatives on that date. He also denied assaulting his wife on November 6, 1987, or making threatening telephone calls to her at any time, including March 26, 1988. Finally, Foster testified

---

**7.** In a separate proceeding, Mrs. Foster moved for an extension of the civil protection order. See *Cruz–Foster v. Foster*, 597 A.2d 927 (D.C.1991).

**8.** We assume, for the purposes of this appeal, that the United States Attorney's Office had no notice of the contempt proceeding.

**9.** Mrs. Foster's attorney conceded that she had failed to sustain her burden of proof on four of the seven counts and asked to "withdraw" those counts. The court made clear, however, that jeopardy had attached as to those counts and granted judgments of acquittal instead.

that he had not threatened his mother-in-law but, to the contrary, had complied with the terms of the CPO.

The court found Foster guilty on four counts of criminal contempt, including those based upon the November 6, 1987, and May 21, 1988, assaults on Mrs. Foster.[10] As to those, the judge said:

The Court is satisfied beyond a reasonable doubt that you did, contrary to your testimony, assault your wife near Kalorama Park, 11/6/87, that leading to the injuries described and testified to.

The Court is also satisfied beyond a reasonable doubt that you committed the assault alleged to have occurred, and the Court is satisfied did in fact occur on May 21st, 1988, at the Argonne address, which led to your wife's hospitalization.

The court found Foster not guilty, however, of the remaining counts of criminal contempt, including the threats allegedly made against Mrs. Foster on March 26, 1988.

### 2. *Subsequent Criminal Proceedings*

On July 21, 1988, about two weeks before the contempt trial, the United States Attorney's Office filed a complaint charging Foster with a single count of assault with intent to kill while armed. The complaint and supporting affidavit alleged that on May 21, 1988, Michael Foster assaulted and tried to kill his wife, Ana Foster, at her apartment on Argonne Place. After a preliminary hearing, Foster was held for further action by the grand jury. Some time later—after the contempt trial—Foster filed a motion to dismiss the complaint and enjoin the grand jury proceedings, but while that motion was pending, the grand jury on January 19, 1989, returned a five-count indictment charging Foster with one count of simple assault, three counts of threats, and one count of assault with intent to kill. The offenses were alleged to have occurred on November 6, 1987 (simple assault, count I), November 12, 1987 (threats, count II), March 26, 1988 (threats,

count III), May 17, 1988 (threats, count IV), and May 21, 1988 (assault with intent to kill, count V); Mrs. Foster was named as the complainant in all five counts. All of these charges were based on events for which Foster had already been tried in the contempt proceeding before Judge Murphy. The November 6 and May 21 assaults were the basis of two of his contempt convictions, while the three charges of threats were based on incidents for which Foster was acquitted in the contempt trial.

Foster filed a motion to dismiss the indictment on the same double jeopardy grounds asserted in his previous motion to dismiss the complaint. In addition, with respect to counts II, III and IV, he moved to dismiss on the ground of collateral estoppel. In its opposition the government admitted that the five offenses alleged in the indictment were the same as those for which Foster had already been tried in the contempt proceeding. The government maintained, however, that principles of double jeopardy did not bar further prosecution because the legislature intended to allow multiple punishments, and because the contempt in this case was different from a substantive criminal offense.

The trial court denied the motion to dismiss in an oral ruling, followed a week later by a written order. Citing *United States v. Rollerson*, 308 F.Supp. 1014 (D.D.C.1970), *aff'd*, 145 U.S.App.D.C. 338, 449 F.2d 1000 (1971), a summary contempt case, the court said in its order that under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), "the charges currently before the Court are not duplicative of the contempt charges of which defendant was convicted in 1988." The court continued:

In the Intrafamily case defendant was found to be in violation of a Civil Protection (consent) Order whereby he was found to be in criminal contempt of Court. The elements of criminal contempt are "a contemptuous act and a wrongful state of mind". *See [In re]*

---

**10.** The court also found Foster guilty of contempt based on threats made against his wife on November 17, 1988, and a November 4, 1987, violation of the stay-away order relating to Mrs. Rivas.

*Gorfkle,* 444 A.2d 934, 939 (D.C.1982), citing *In re Farquhar,* 160 U.S.App.D.C. 295, 298, 492 F.2d 561, 564 (1973).... [N]one of the charges has as an element a contemptuous act or a wrongful state of mind.

Referring to D.C.Code § 16–1002(c) (1989), the court concluded that "there is clearly an intent by the legislature to allow different remedies for a violation of Civil Protection Orders: one for contempt after willful violation of the order to protect the petitioner and the ability of the Court to enforce its orders, and additional proceedings in the Criminal Division to protect the community." [11] Neither the oral ruling nor the written order addressed Foster's collateral estoppel argument.

### B. *Dixon*

On March 9, 1987, appellee Dixon was arrested on a charge of second-degree murder while armed. He was later released on a $1500 surety bond. The printed release form contained a provision that Dixon's freedom was conditioned upon his not committing a criminal offense. Some time later the grand jury returned an indictment charging him with first-degree murder while armed. On January 15, 1988, while awaiting trial on the murder charge, Dixon was arrested for possession of cocaine with intent to distribute it, and on January 21 he was indicted for that offense.

The government then filed a motion requesting modification of the conditions of Dixon's release in the murder case in light of his indictment on the cocaine charge. Judge Walton, to whom the murder case was assigned, issued an order requiring Dixon to "show cause why he should not be held in contempt of court or have the conditions of his pretrial release modified." The order noted that "[a]mong the conditions of [Dixon's] pretrial release imposed by the court [was the requirement] that he '[r]efrain from committing any criminal offense....'" The order advised Dixon of his right to be represented by counsel at the hearing and to present evidence in his own behalf.

The testimony of four Metropolitan Police officers at the show cause hearing established that on the afternoon of January 15, 1988, two officers patrolling in an unmarked police car saw Dixon and a woman standing outside an apartment building in an area that was a known "open air market" for narcotics. The officers watched as the woman handed Dixon some money. Then, as the officers got out of their car, Dixon saw them and fled into the apartment building and up the staircase, carrying a bundle of white packets in his hand. When he reached the second story landing, Dixon dropped the bundle of packets; the officers recovered it and placed Dixon under arrest. Within the bundle were nineteen zip-lock plastic bags, bound by a rubber band, containing 2716 milligrams of cocaine (approximately 150 to 200 milligrams per bag). Dixon's counsel cross-examined the government witnesses and introduced evidence on Dixon's behalf. After each side had presented closing arguments, Judge Walton "conclude[d] that the government ha[d] established beyond a reasonable doubt that [Dixon] was in possession of drugs and that those drugs were possessed with the intent to distribute them." Since such possession was a violation of a condition of Dixon's release, the judge found him guilty of criminal contempt under D.C.Code § 23–1329(c) (1989) [12] and sentenced him to 180 days in jail.

---

**11.** D.C.Code § 16–1002(c), which is part of the Code chapter dealing with intra-family proceedings generally, provides in pertinent part:

> The institution of criminal charges by the United States Attorney shall be in addition to, and shall not affect[,] the rights of the complainant to seek any other relief under this chapter.

This language was quoted by the trial court in its order.

**12.** D.C.Code § 23–1329 provides in pertinent part:

> (a) A person who has been conditionally released pursuant to section 23–1321 and who has violated a condition of release shall be subject to revocation of release, an order of detention, and prosecution for contempt of court.
>
> \*   \*   \*   \*   \*   \*
>
> (c) Contempt sanctions may be imposed if, upon a hearing and in accordance with princi-

Dixon thereafter moved to dismiss the cocaine indictment, arguing that prosecution on that charge was barred by the Double Jeopardy Clause. The court granted the motion, reasoning that the drug charge was the "same offense" as the criminal contempt conviction, and citing *Blockburger v. United States, supra,* 284 U.S. at 304, 52 S.Ct. at 182, as stating the applicable test for determining whether the two offenses were the same for double jeopardy purposes. Dixon's alleged contempt had been based on that part of the court's release order directing him to refrain from committing any criminal offense. To prove the contempt, the government had presented evidence that he possessed nineteen packets of cocaine with the specific intent to distribute them. The court said:

> These are precisely the same *facts* which the government would need to prove in the instant [drug] case in order to secure a conviction, and no additional facts would need to be proven. Thus, while contempt is itself a general intent offense, the particular contempt of which [Dixon] was convicted included a specific intent element as a necessary component of proving the commission of a criminal offense.

*United States v. Dixon, supra,* 117 Daily Wash.L.Rptr. at 13 (emphasis in original).

The court also rejected the government's argument, based on *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), that even if the offenses were not separate and distinct under a *Blockburger* analysis, the *Blockburger* test was solely a rule of statutory construction and did not control when there was a clear indication of contrary legislative intent. The government argued that Congress clearly intended contempt of court and drug trafficking to be separate offenses: the contempt statute was designed to preserve the authority of the court and the integrity of the judicial process, where-

as the purpose of the drug statute was to protect society from the evils of drug trafficking. The court, however, interpreted *Albernaz* as saying only that a contrary legislative intent could defeat multiple punishments otherwise allowable under *Blockburger. Albernaz,* said the court, "certainly does not hold that multiple prosecution or punishment of offenses which *fail* the *Blockburger* test is nonetheless permissible if the legislature manifested a clear intention to authorize such multiple punishments." *United States v. Dixon, supra,* 117 Daily Wash.L.Rptr. at 13 (emphasis in original), citing *Albernaz, supra,* 450 U.S. at 345, 101 S.Ct. at 1145 (Stewart, J., concurring).

Finally, the court acknowledged that a judge's unilateral decision to conduct a criminal contempt hearing would preempt subsequent prosecution for the offense which also constituted the contempt. The court suggested, however, that the government could avoid such a result by requesting the judge to defer the contempt proceeding. The court reasoned that "[i]n most—but perhaps not all—instances, it would seem appropriate to accommodate that request and give the government a reasonable opportunity to prosecute the substantive offense." *United States v. Dixon, supra,* 117 Daily Wash.L.Rptr. at 17.

## II

The Double Jeopardy Clause protects persons charged with crimes in three different but related ways. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The two cases before us implicate the first

ples applicable to proceedings for criminal contempt, it is established that such person has intentionally violated a condition of his release. Such contempt proceedings shall be expedited and heard by the court without a jury. Any person found guilty of criminal contempt for violation of a condition of release shall be imprisoned for not more than six months, or fined not more than $1,000, or both.

two protections. Appellant Foster seeks to bar a second prosecution for the assaults that led to his contempt convictions, as well as a second prosecution on the threats charges for which he was found not guilty in the contempt proceeding. Appellee Dixon likewise seeks, and in fact has been granted, protection from being twice prosecuted for possession of cocaine with intent to distribute it.

In the briefs and at oral argument, the parties presented elaborate discussions in support of their respective positions on the subject of double jeopardy. The opinion of the trial judge in *Dixon* likewise analyzed at length the issues as he saw them. Soon after we heard oral argument, however, the Supreme Court decided the case of *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). That decision has greatly simplified the issues and has made our task much easier than it was when these cases first landed on our docket. With *Grady* on the books, we need not consider most of the arguments presented by the parties or the points made by the trial court in *Dixon*. Rather, we hold that *Grady* is controlling and that it requires us to sustain the claim of double jeopardy in both cases.

In *Grady v. Corbin* the defendant, Thomas Corbin, received two traffic tickets after his automobile crossed the center line on a New York highway and struck two oncoming cars, causing the death of one person and injuries to another. One ticket charged Corbin with the misdemeanor of driving while intoxicated,[13] and the other charged him with failing to keep to the right of the median. Within a few days, the district attorney's office began to gather evidence for a homicide prosecution. Corbin, however, appeared before a town justice court about three weeks later and pleaded guilty to both traffic charges. No member of the district attorney's office was present, and the presiding judge was unaware of the fatality or of the pending homicide investigation. The judge accepted the plea and later imposed a $350 fine

and suspended Corbin's license for six months.

Two months after that, a grand jury indicted Corbin on several charges, including manslaughter and third-degree reckless assault, arising out of the traffic accident. Corbin challenged the indictment on double jeopardy grounds. The New York Court of Appeals sustained his challenge, and the state brought the case to the Supreme Court. That Court, adopting a "suggestion" made in *Illinois v. Vitale*, 447 U.S. 410, 420, 100 S.Ct. 2260, 2267, 65 L.Ed.2d 228 (1980), held that the Double Jeopardy Clause bars a second prosecution "if the prosecution [seeks] to establish an essential element of the second crime by proving the conduct for which the defendant was convicted in the first prosecution." *Grady v. Corbin, supra,* 110 S.Ct. at 2087.

The Court in *Grady* began its analysis by referring to "the traditional *Blockburger* test" for determining whether one offense is a lesser included offense of another:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger v. United States, supra,* 284 U.S. at 304, 52 S.Ct. at 182, cited in *Grady v. Corbin, supra,* 110 S.Ct. at 2090. The Court concluded, however, that *Blockburger* did not fully resolve the double jeopardy issue:

> [A] subsequent prosecution must do more than merely survive the *Blockburger* test. As we suggested in [*Illinois v.*] *Vitale,* the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted.

---

**13.** A blood test, taken shortly after the accident, revealed that Corbin had a blood alcohol level of .19 percent, almost twice the level at which it is illegal to operate a motor vehicle in New York.

*Id.* at 2093 (footnote omitted.) This is not, the Court said, an "actual evidence" or "same evidence" test. "The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct." *Id.*

Our focus here, then, must be on the conduct underlying the contempt convictions of Mr. Dixon and Mr. Foster, rather than on the nature of the evidence or the identity of the witnesses at the two contempt trials. It is for this reason that we have summarized in some detail the facts presented at each of the contempt proceedings. Given those facts, and given the criminal charges against each defendant, it is obvious—indeed, it is undisputed—that the conduct which underlay their contempt prosecutions included, in whole (*Dixon*) or in part (*Foster*), the very same conduct for which the government now seeks to try them in the two pending criminal cases. *Grady v. Corbin* compels us to hold that those cases cannot be tried, now or ever. The Double Jeopardy Clause forever bars any further prosecution of either Dixon or Foster for the conduct which led to their contempt convictions or, in Foster's case, any conduct charged which the court, after hearing the evidence, held did not constitute contempt.

We note that the highest courts of at least two states, in post-*Grady* cases, have come to the same conclusion which we reach today. In *State v. Magazine*, 302 S.C. 55, 393 S.E.2d 385 (1990), the Supreme Court of South Carolina held that a contempt conviction for violating a civil protection order issued by a family court barred a subsequent prosecution for assault and battery based on the same facts which constituted the contempt. Because the state, in the assault trial, "proved the same conduct for which appellant was previously criminally sanctioned by the family court," the court held that, "under the *[Grady v.] Corbin* test, the successive prosecution in this case violated the Double Jeopardy Clause." *Id.* at 58, 393 S.E.2d at 387. More recently, in *State v. Kipi*, 72 Haw. 164, 811 P.2d 815, *cert. denied,* —— U.S. ——, 112 S.Ct. 194, 116 L.Ed.2d 154 (1991), the Supreme Court of Hawaii—citing *State v. Magazine*—af-

firmed the dismissal of a complaint for burglary and threats because the defendant had previously been convicted of criminal contempt for violating a family court protective order. The contempt had consisted of the defendant's breaking into his former girl friend's home and threatening her and her housemates—the very same conduct which formed the basis of the criminal charges. Recognizing that the Supreme Court had broadened the scope of double jeopardy protection in *Grady v. Corbin,* the Hawaii court held that "under the *Grady* rule" Kipi could not be prosecuted a second time "for offenses based on the same conduct as the contempt offense for which he was charged, convicted, and sentenced." *Id.* at ——, 811 P.2d at 820. Although we are hesitant to proclaim a trend, we find ourselves fully in agreement with these decisions for the reasons we have already stated. *See also State v. Mojarro,* 169 Ariz. 1, 816 P.2d 260 (Ariz.Ct. App.1991) (contempt prosecution for refusing to testify, in violation of a court order requiring defendant to testify, requires dismissal of subsequent indictment for "hindering prosecution" by refusing to testify); *State v. Vanselow,* 61 Ohio Misc.2d 1, 6, 572 N.E.2d 269, 272–273 (Ohio Mun.Ct.1991) (contempt prosecution for violating protective order issued by domestic relations court bars subsequent criminal prosecution for same conduct).

*Amici* urge us to draw a distinction between the two cases before us. Regardless of what we decide in *Dixon,* they maintain that there was no prior jeopardy in *Foster* because the contempt proceeding in that case was initiated by private parties, Foster's wife and mother-in-law. In support of their argument, *amici* rely on a recent case from Texas, *Ex parte Williams,* 799 S.W.2d 304 (Tex.Crim.App.1990) (en banc), which held that a prosecution for attempted murder was not barred by a prior contempt conviction based on the same conduct. With all due respect, we find the reasoning in *Williams* flawed and its holding unpersuasive.

The most glaring weakness in the *Williams* opinion is its utter failure to dis-

cuss *Grady v. Corbin* at all. In fact, *Williams* cites *Grady* only once, as authority for the unremarkable proposition that "the test for what constitutes the 'same offense' can differ according to whether single or successive prosecutions are involved." *Id.* at 307. The *Williams* court simply ignored the obvious fact, recognized specifically by the Hawaii court in *Kipi,* that *Grady* had "broadened the scope of double jeopardy protection." *State v. Kipi, supra,* 72 Haw. at ——, 811 P.2d at 819. With one exception, the several cases cited in *Williams* were all decided before *Grady* and are thus at least suspect as precedent on the issue presented here.[14]

Moreover, the Supreme Court has told us in no uncertain terms that criminal contempt "is a crime in the ordinary sense ... [and that] convictions for criminal contempt are indistinguishable from ordinary criminal convictions, for their impact on the individual defendant is the same." *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522 (1968); *see In re Marshall,* 549 A.2d 311, 315 (D.C.1988) (because "Marshall's conviction of contempt was certainly for a criminal violation," he was required, like any "person convicted" of a crime, to pay a specified sum to the Crime Victims' Compensation Fund). Case law has emphasized that the "impact on the individual defendant" is the main concern in determining whether jeopardy has or has not attached. *See, e.g., United States v. Wilson,* 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975) (double jeopardy protections are based on "principles of fairness and finality [which] require that [the defendant] not be subjected to the possibility of further punishment"); *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971) (plurality opinion of Harlan, J.) ("society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in [the Double Jeopardy Clause]"); *Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223–224, 2 L.Ed.2d 199 (1957) ("The underlying idea [of the Double Jeopardy

Clause], one that is deeply ingrained in [our] system of jurisprudence," is to avoid "subjecting [the defendant] to embarrassment, expense, and ordeal and compelling him to live in a continuing state of anxiety and insecurity"). While these and other cases speak in terms of the state or the sovereign as the prosecuting authority, their emphasis is plainly not on the identity of the prosecutor but on the impact of the trial on the defendant. The *Williams* court, in our view, went astray in failing to recognize this. It is self-evident that the impact of a contempt prosecution on any defendant—exposure to possible fine or imprisonment, or both—would be the same regardless of whether the contempt adjudication is sought by the government or a private party (or even the court itself, as in *In re Marshall, supra* ). Thus we note our disagreement with *Williams* and hold that the identity of the prosecuting party in the contempt proceeding is irrelevant to the double jeopardy issue.

Finally, we offer an observation on the limits of our holding in the *Foster* case. The reader should not conclude that civil protection orders can no longer be enforced by contempt proceedings in the post-*Grady* era. The *Grady* Court itself recognized that a single act or transaction may constitute two or more types of "conduct," one of which may be punishable in a contempt proceeding and another in a subsequent criminal proceeding. The Court said that its holding

> would not bar a subsequent prosecution on the homicide and assault charges if the bill of particulars revealed that the State would not rely on proving the conduct for which Corbin had already been convicted (*i.e.,* if the State relied solely on Corbin's driving too fast in heavy rain to establish recklessness or negligence).

110 S.Ct. at 2094 (footnote omitted). Thus the Court envisioned Corbin's act of driving and hitting two other cars as encompassing at least three different types of conduct: driving while intoxicated, failing to keep right of the median (for both of which he

14. The one exception is *Garcia v. State,* 806 S.W.2d 835 (Tex.Crim.App.1990) (en banc), which did not involve the contempt/subsequent prosecution issue that confronts us in this case.

was convicted in traffic court), and driving too fast in heavy rain (for which he was not convicted in traffic court). In like manner, when a civil protection order prohibits assaults and also requires the respondent to stay away from the petitioner, and an assault is committed against the petitioner, the language we have quoted from *Grady* suggests that the breach of the stay-away portion of the order might be punished as a contempt without jeopardizing a later criminal prosecution for the assault itself. That hypothetical case, of course, is not before us today,[15] and thus we go no further than to note the possibility that it might be distinguishable from *Foster*.

For the reasons stated, we affirm the trial court's dismissal of the indictment in *Dixon* and reverse the denial of the motion to dismiss the indictment in *Foster*.

*Affirmed as to Dixon, reversed as to Foster.*

---

**15.** In the contempt proceeding Foster was convicted of one violation of the order to stay away from his mother-in-law, see note 10, *supra*, but the later indictment did not include that incident.